UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Andrea Fonseca, | |
| *Plaintiff,* | No. 23 CV 3688 |
| v. | Judge Lindsay C. Jenkins |
| Hornblower Cruises and Events, LLC, | |
| *Defendant.* | |

MEMORANDUM OPINION AND ORDER

Plaintiff Andrea Fonseca brings this lawsuit against her former employer, Defendant Hornblower Cruises and Events, LLC, for violations of federal and state employment law and a state whistleblower statute. [Dkt. 16.] Hornblower moves to dismiss three of the seven claims in Fonseca's Amended Complaint and part of a fourth claim pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. 20.] For the reasons stated below, Hornblower's motion is granted in part and denied in part.

## I.    Background

The following facts are taken from the Amended Complaint and taken as true for present purposes. *See Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022). Fonseca began working at Hornblower as a part-time, hourly employee in September 2018. [Dkt. 16 ¶¶ 9–10.] Early on, Fonseca was warned about "pervasive sexual overtones in the environment," which for Fonseca manifested in the form of sexual harassment, primarily from coworker Joelle Tatter. [*Id.* ¶¶ 14–15, 17–18.]

Fonseca reported the harassment on several occasions, but to no avail. She told her team lead, Lorna Ramirez, who attempted to relay Fonseca's complaints to her

1

superiors, but the complaints were allegedly ignored. [*Id.* ¶ 20.] Fonseca met with Director Benia Gurrola, who treated Fonseca's reports dismissively and suggested that Fonseca should have confronted Tatter directly. [*Id.* ¶¶ 21–23.] Two weeks later, Gurrola proposed the solution of physically separating Fonseca's and Tatter's workstations, which proved ineffective, and Gurrola allegedly falsely assured Fonseca that she would not need to work with Tatter in the future. [*Id.* ¶¶ 24–25.] These measures did not end the harassment; in fact, the harassment escalated. [*Id.* ¶¶ 26–27.] Fonseca alleges that Gurrola also began retaliating against her, including by attempting to sabotage Fonseca and making Tatter report directly to Fonseca, despite knowing about the ongoing harassment. [*Id.* ¶¶ 28–30.] When Fonseca complained again, Gurrola told her that Fonseca "needed to manage the situation through 'performance management.'" [*Id.* ¶ 31.] Fonseca complied with this directive, but she continued to face hostility at Hornblower. [*Id.* ¶ 32.]

Fonseca had the opportunity to supplement her hourly income by working overtime hours for higher pay, but she declined because she did not want to subject herself to the working conditions described above. [*Id.* ¶ 11.] Nevertheless, Fonseca was sometimes forced to work overtime off the clock and was not compensated for all the hours she worked, both regular and overtime hours. [*Id.* ¶¶ 12, 34–36.] When she discovered that she was being underpaid, Fonseca reported it to Gurrola and a manager, Isabella Prenta. [*Id.* ¶ 37.] They agreed to correct the discrepancies in Fonseca's pay, but allegedly they never did, despite Fonseca's continued reports of underpayment. [*Id.* ¶¶ 38–40.]

Fonseca alleges that when she "cautiously disclosed her concerns" to Jeff Miller, a new vice president, Hornblower began a campaign of retaliation against her that culminated in her termination. [*Id.* ¶ 41; *see id.* ¶¶ 42–45.] For example, on one occasion, Fonseca was presented with an urgent issue as she was returning from a break, and she forgot to clock back in as she returned to work. [*Id.* ¶ 47.] As a result, Prenta accused Fonseca of leaving early; although Fonseca explained what had happened, Prenta disciplined her, and she was not paid for the hours she worked while off the clock. [*Id.* ¶¶ 48–50.] In October 2021, Fonseca disclosed "the ongoing unlawful conduct at her workplace" to the Illinois Department of Human Rights ("IDHR"). [*Id.* ¶ 54.] Hornblower terminated Fonseca's employment on November 2, 2021, allegedly "in retaliation for her complaints of sexual harassment." [*Id.* ¶ 55.]

After exhausting her administrative remedies, Fonseca filed this suit against Hornblower. [Dkt. 1.] Hornblower moved to dismiss two of her five claims [Dkt. 12], and in lieu of responding, Fonseca filed the operative Amended Complaint, which added two claims. [Dkt. 16.] Hornblower again moved to dismiss in part. [Dkt. 20.] It does not challenge Count I (Title VII and Illinois Human Rights Act ("IHRA") hostile work environment), Count II (Title VII and IHRA retaliation), or Count IV (unpaid wages Fair Labor Standards Act ("FLSA") and Illinois Minimum Wage Law ("IMWL")), but it argues that Count III (Illinois Whistleblower Act ("IWA") retaliation), Count V (FLSA and IMWL retaliation), Count VI (violation of the Illinois Wage Payment and Collection Act ("IWPCA")), and Count VII (Illinois common law retaliatory discharge) must be dismissed pursuant to Rule 12(b)(6).

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleadings. "To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim to relief that is plausible on its face." *Page*, 52 F.4th at 346 (cleaned up). The Court takes all factual allegations as true and draws reasonable inferences in favor of the plaintiff when ruling on a motion to dismiss. *Id.*

## III.    Analysis

Count V—for retaliation in violation of the FLSA and the IMWL—requires little discussion. Both parties agree that the FLSA contains a cause of action for retaliation, but the IMWL does not. [Dkt. 21 at 6–7; Dkt. 22 at 7; Dkt. 25 at 3.] The Court therefore grants Hornblower's motion to dismiss Count V with prejudice as to the IMWL retaliation claim, but the FLSA component survives. Below, the Court addresses the other claims Hornblower moves to dismiss.

### A.    Count III: IWA Retaliation

First, Hornblower moves to dismiss Fonseca's IWA retaliation claim. [Dkt. 21 at 4–6.] The IWA protects employees from retaliation for disclosing unlawful conduct to a government or law enforcement agency, 740 ILCS 170/15(b) ("Section 15"), or "for refusing to participate in an activity that would result in a violation of … law, rule, or regulation," 740 ILCS 170/20 ("Section 20"). These are distinct claims, *see Rehfield v. Diocese of Joliet*, 182 N.E.3d 123, 133–34 (Ill. 2021) (Section 15); *Roberts v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 135 N.E.3d 891, 900–01 (Ill. 2019) (Section 20), and Fonseca alleges that Hornblower violated both provisions [Dkt. 16 ¶¶ 71–72], but the Court agrees with Hornblower that Fonseca's allegations are deficient.

4

Hornblower argues that Fonseca's Section 15 claim is deficient because she fails to allege a causal connection between her report to the IDHR and her termination. [Dkt. 21 at 4–5.] *See, e.g.*, *Carter v. GC Elecs.*, 599 N.E.2d 11, 15 (Ill. App. Ct. 1992). Fonseca alleges that she "disclosed the ongoing unlawful conduct at her workplace" to the IDHR in October 2021 and that she was terminated on November 2, 2021 "in retaliation for her complaints of sexual harassment," but she does not allege who at Hornblower, if anyone, knew about her report to the IDHR. [*See* Dkt. 16 ¶¶ 54–55, 71, 73 (alleging disclosure and retaliation, but not knowledge). *Contra* Dkt. 22 at 5.][1] Her allegations are not inconsistent with her report to the IDHR being a cause of her termination, however. She alleges that she was terminated "in retaliation for her complaints of sexual harassment," which the Court infers to overlap at least partially with her IDHR report. Because Fonseca may be able to fix this pleading deficiency, she will be given one more opportunity to replead this claim.[2]

---

[1]    Fonseca suggests that she can sufficiently alleging causation if she "has generally alleged that Defendants were aware of her protected activity" [Dkt. 22 at 5 (cleaned up)], but the case she quotes continues with "and [Plaintiff] specifically alleged that [Defendant] met with the police officers who responded to her call on March 29." *McCowan v. Motel Sleepers, Inc.*, 2018 WL 3997361, at *8 (N.D. Ill. Aug. 21, 2018). Further, Fonseca has not alleged, generally or specifically, any knowledge on Hornblower's part about her IDHR report.

[2]    Fonseca indicates that she could fix this deficiency by pleading a single new paragraph stating, "Defendant was aware of Plaintiff's call to IDHR." [Dkt. 22 at 6 n.1.] The Court is less sure. While the Court takes well-pleaded factual allegations as true, it "need not accept as true statements of law or unsupported conclusory factual allegations." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (quotation omitted). Without supporting allegations, that single paragraph may be too conclusory to permit a reasonable inference that Hornblower knew about the IDHR complaint. *Cf. McCowan*, 2018 WL 3997361, at *8. Further, Fonseca asserts—without citing any authority—that the causation question in IWA claims is whether retaliation is a "motivating factor" [Dkt. 22 at 5], but the Court notes that retaliation claims often require but-for causation, *see, e.g.*, *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (Title VII); *cf. Jackson v. Harvey Park Dist.*, 2017 WL 11716090, at *2 & n.2 (N.D. Ill. July 6, 2017) (not resolving the applicable causation standard for IWA claims).

Regarding Fonseca's Section 20 claim, Hornblower argues that Fonseca fails to allege that she refused to participate in activity that violates the law. [Dkt. 21 at 5–6.] Fonseca identifies three examples of such refusals: (1) she "refused to act as her harasser[ ] [Tatter's] direct supervisor because it would result in an unsafe and hostile work environment, but was forced to do so anyway"; (2) she "refused to treat her subordinate's ongoing sexual harassment of her as a performance issue, and objected to her managers' directive to avoid challenging her harasser's behavior directly, but was forced to do so anyway"; and (3) she "refused to work additional hours without being paid and insisted unsuccessfully that discrepancies in her pay be resolved." [Dkt. 16 ¶ 72.] Hornblower argues that Fonseca's Section 20 claim fails because she never refused to participate in any of these activities. [Dkt. 21 at 5–6.]

The Court agrees with Hornblower that Fonseca's allegations are insufficient. Regarding the first two points, Fonseca does not allege that she ever refused to act as Tatter's supervisor or treat sexual harassment as a performance issue. [*Cf.* Dkt. 22 at 6–7 (not citing any allegations in the Amended Complaint).] Rather, she "reported the harassment," raised "concerns," was "falsely assured … that she would not have to work directly with Ms. Tatter anymore," and "request[ed]" that she be "distance[d]… from Ms. Tatter" in the workplace hierarchy. [Dkt. 16 ¶¶ 20, 25, 29.] But Fonseca does not allege that she *refused* any assignment or instruction with respect to Tatter, which is fatal to her Section 20 claim. *See Roberts*, 135 N.E.3d at 900–01. Indeed, since she alleges that her requests to be relieved from supervising Tatter were rejected or ignored, it may be difficult to plead a Section 20 claim based

6

on Fonseca's response to Tatter's harassment. The Court will, however, give Fonseca a chance to replead these allegations. If she does so, she will need to allege that she actually refused to participate in an aspect of her supervision of Tatter that she believed to be unlawful, not merely that she expressed displeasure at, or requested changes to, her work responsibilities.[3]

Turning to the third allegedly unlawful activity, Fonseca argues that she plausibly alleged that she refused to work off the clock without pay. [Dkt. 22 at 6.] While she uses the words "refused to work without pay" [Dkt. 16 ¶ 39], the fuller context of those allegations shows that she has not pleaded a plausible claim to relief. *See Page*, 52 F.4th at 346. Fonseca alleges that she was routinely underpaid based on the hours she worked, she sometimes agreed to work overtime for extra pay, but her paychecks seldom reflected the extra hours she worked. [Dkt. 16 ¶¶ 34–36.] She reported the underpayment and was told it would be corrected, but the underpayment persisted, and Fonseca "continued to report" it. [*Id.* ¶¶ 37–39.] It was in this context that Fonseca "informed [Prenta and Gurrola] that she refused to work without pay and planned to escalate the matter." [*Id.* ¶ 39.] Prenta and Gurrola "insisted they would handle it themselves," but the underpayment was never corrected. [*Id.* ¶¶ 39–40.] The only reasonable interpretation of these allegations is that Fonseca complained about past underpayment and said that she would not work without pay, *not* that she had been told to work without pay (or overtime pay) and refused.

---

[3]      Because the Court holds that Fonseca did not allege refusal, it does not reach Hornblower's separate argument that the first two items in paragraph 72 are not unlawful. [Dkt. 21 at 5–6.] If Fonseca does replead these allegations, she should make any changes in response to this point as well. She will not be given another chance to do so if she does not.

Reviewing her other allegations leads to the same conclusion. She alleges that she *complied* with instructions to work off the clock [*id.* ¶¶ 42–43] and that after she inadvertently failed to clock back in after a break, she was not compensated [*id.* ¶¶ 47–50]. Nor does her allegation that she worked 60–80 hours off the clock indicate that she refused any request. [*See id.* ¶ 81.] While the Court must draw reasonable inferences in Fonseca's favor, *Page*, 52 F.4th at 346, it would not be reasonable to interpret these allegations as refusals to participate in unlawful activity, as opposed to reports or complaints about past activity. Without the support of these factual allegations, Fonseca's allegation that she "refused to work additional hours without being paid" is too conclusory to support a plausible claim. *See Bilek*, 8 F.4th at 586. Thus, Fonseca's claim fails, *see Roberts*, 135 N.E.3d at 900–01, but she will have one more chance to attempt to plausibly allege that she refused instructions to engage in unlawful activity and was retaliated against in violation of Section 20.[4]

### B.    Count VI: IWPCA Violation

Next, Hornblower moves to dismiss Fonseca's IWPCA claim. [Dkt. 21 at 7–9.] "The IWPCA provides employees with a cause of action against employers for the timely and complete payment of earned wages." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (citing 820 ILCS 115/3). "The IWPCA defines 'wages' as 'compensation owed an employee by an employer pursuant to an employment

---

[4]    Fonseca argues that even if she ultimately acquiesced to participation in unlawful activity, that doesn't defeat her claim because she initially refused and was retaliated against based on that refusal. [Dkt. 22 at 6–7.] As the Court has explained, the Amended Complaint does not plausibly allege such refusals, but the Court will consider this argument if Fonseca provides more detail about what she was asked to do and what she said in response.

contract or agreement between the 2 parties.'" *Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) (quoting 820 ILCS 115/2). To state a claim under the IWPCA, a plaintiff must plausibly allege that she is claiming compensation owed pursuant to the terms of the contract because the IWPCA "provides no substantive relief beyond what the underlying employment contract requires." *See id.* (quotation and citation omitted). Thus, while the contract and its terms can be implicit, *id.*; *Enger*, 812 F.3d at 568–69, a plaintiff must sufficiently allege the existence and breach of those terms, *cf., e.g.*, *Brand v. Comcast Corp.*, 2013 WL 1499008, at *6 (N.D. Ill. Apr. 11, 2013) (plaintiff must allege more than that the employer is bound by overtime laws); *Smith v. C.H. James Restaurant Holdings, L.L.C.*, 2012 WL 255806, at *2 (N.D. Ill. Jan. 26, 2012) (conclusory allegation that there was an agreement to pay plaintiff for hours worked off the clock was insufficient).

Hornblower argues that Fonseca's allegations that she had an agreement to correct pay discrepancies for hours worked off the clock are insufficient. [Dkt. 21 at 8–9; Dkt. 25 at 4–5.] The Court declines to determine whether these allegations are sufficient to state a claim because the Amended Complaint clearly alleges a violation of the IWPCA in paragraphs 47–50.[5] There, Fonseca alleges that during a shift when she was working on the clock, she inadvertently failed to clock back in after a break. [Dkt. 16 ¶¶ 47–48.] Prenta noticed that Fonseca had not clocked in for the remainder of her shift and accused Fonseca of leaving early without permission, when Fonseca had in fact been at work. [*Id.* ¶ 48.] Fonseca explained the mistake, but she was not

---

[5] Fonseca does not expressly invoke her allegations in these paragraphs in her brief [*see* Dkt. 22 at 3–4], but the Amended Complaint incorporates them by reference [Dkt. 16 ¶ 88].

compensated for the balance of her shift worked off the clock. [*Id.* ¶¶ 49–50.] These allegations, if true, mean that Fonseca was not paid for work done on her official shift, so her IWPCA claim does not solely involve a demand for wages for work performed outside of the normal scope of the employment agreement, which is sufficient to state a claim at this stage. The Court does not address whether Fonseca can maintain her IWPCA claim with respect to other hours she allegedly was not compensated for. If discovery reveals that Fonseca lacks evidence to support part of this claim, the scope of the claim may be able to be pared down at summary judgment.

### C.    Count VII: Common Law Retaliatory Discharge

Finally, Hornblower moves to dismiss Fonseca's common law retaliatory discharge claim. [Dkt. 21 at 9–12.] Although at-will employees like Fonseca can be fired without cause, Illinois common law recognizes retaliatory discharge claims, "a limited and narrow exception to the general rule that employees are at-will." *Roberts*, 135 N.E.3d at 896 (citation omitted). "To state a claim for retaliatory discharge, an employee must plead that (1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities, and (3) the discharge violates a clearly mandated public policy." *Id.* (citation omitted). To strike the appropriate balance between an employer's right to fire at-will employees and the state's public policy, the Supreme Court of Illinois has demanded more than "[a] broad, general statement of policy" to satisfy the third element. *Turner v. Memorial Med. Ctr.*, 911 N.E.2d 494, 502 (Ill. 2009). A private dispute cannot be the basis for a public policy mandate; the "matter must strike at the heart of a citizen's social rights, duties, and responsibilities." *Id.* at 501 (quotation omitted). Moreover, a plaintiff must do more

10

than cite a legal rule or principle; she "must show that [her] discharge violated the public policy that the cited provision clearly mandates." *Id.* at 505 (citations omitted).

Fonseca fails to establish a clearly mandated public policy. The Amended Complaint does not allege the existence of a clearly mandated public policy. [*See* Dkt. 16 ¶¶ 93–94 (alleging only that Fonseca was retaliated against for reporting unlawful and improper conduct by her supervisors but not).] And even if a plaintiff need only lay the factual foundation in her complaint and can add the legal analysis in a brief, Fonseca has failed to do so. Her opposition brief argues that the allegedly unlawful and improper conduct she reported "all … are clear violations of public policy." [Dkt. 22 at 7–8 (citing Dkt. 16 ¶¶ 17–40).] But the Supreme Court of Illinois has held that this type of threadbare invocation of public policy is inadequate. [*Compare id.* at 7–8 (noting complaints about sexual harassment and off-the-clock work and suggesting that negligently retaining an employee runs counter to public policy), *with Turner*, 911 N.E.2d at 505 ("[T]he mere citation of a constitutional or statutory provision in a complaint will not, by itself, be sufficient to state a cause of action for retaliatory discharge. Rather, an employee must show that the discharge violated the public policy that the cited provision clearly mandates." (citations omitted)).]

Fonseca argues that she need only put Hornblower "on notice that her discharge violated a clear public policy mandate; she is not required to spell out in greater detail than that." [Dkt. 22 at 8.][6] She is correct that Rule 8 requires only a

---

[6]     Fonseca cites *Mollet v. St. Joseph's Hospital Breese* for that proposition, but the court's analysis concerned a motion for more definite statement, not the substantive elements of a retaliatory discharge claim, which followed an intermediate state appellate court decision with similar facts. 2017 WL 1035750, at *2–3 (S.D. Ill. Mar. 17, 2017).

short and plain statement, but the Court's analysis above concerns the substantive elements of a retaliatory discharge claim, not federal pleading requirements. While Fonseca need only plead a short and plain account of the facts that makes it plausible she is entitled to relief, a retaliatory discharge claim requires her to, at minimum, allege the factual basis for a violation of clearly mandated public policy and, whether in a pleading or a brief, explain why the source of the public policy clearly mandates it. *See Turner*, 911 N.E.2d at 505. She has not done so here, but she will be given an opportunity to attempt to replead this claim.

## IV.    Conclusion

For the foregoing reasons, Hornblower's motion to dismiss [Dkt. 21] is granted in part and denied in part. Counts III and VII are dismissed without prejudice. Count V is dismissed with prejudice to the extent that it is based on a retaliation claim under the IMWA; the FLSA component of the claim survives. The motion to dismiss is denied with respect to Count VI.

Fonseca may file a second amended complaint by December 5, 2023. She has asked for leave to add a claim for negligent retention [Dkt. 22 at 8 n.3], and Hornblower did not oppose this request [*see* Dkt. 25 at 5 n.1], so Fonseca may add this claim in her second amended complaint. She may not add any additional claims at this time, and this will be her final opportunity to amend her complaint at this stage of the proceedings. *Cf. Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022)

(explaining that a plaintiff should ordinarily have at least one opportunity to amend her complaint).

Enter: 23-cv-3688
Date:  November 16, 2023

_____
Lindsay C. Jenkins
United States District Judge

13